IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
NO. _1_ : _24__ - cv - __128_____

| | | |
|---|---|---|
| JOHN H. ESPEY, III, M.D., | ) | |
|       Plaintiff, | ) | |
| | ) | |
| v | ) | |
| | ) | COMPLAINT |
| | ) | AND |
| | ) | JURY TRIAL DEMAND |
| UNIVERSITY OF NORTH CAROLINA HEALTH | ) | |
| CARE SYSTEM, an affiliate enterprise of | ) | |
| The University of North Carolina; and, | ) | |
| BENJAMIN E. HAITHCOCK, M.D., in his individual | ) | |
| capacity, | ) | |
|       Defendants. | ) | |

_____

Plaintiff, John H. Espey, III, M.D., by and through his undersigned counsel,

complains of the Defendants, University of North Carolina Health Care System ("UNC Health"),

and Benjamin E. Haithcock, M.D., in his individual capacity, and alleges the following:


## I.  NATURE OF THE ACTION

1.  This is a civil action seeking equitable relief and damages pursuant to the Americans with

Disabilities Act, as amended (42 U.S.C. §§ 12101 et seq.) and Section 504 of The

Rehabilitation Act of 1973 (29 U.S.C. §§ 794 et seq.).   Plaintiff also seeks damages

against the individual defendant for violations of rights arising under the North Carolina

common law.

## II.  JURISDICTION AND VENUE

2.  This Court has jurisdiction of the claims herein pursuant to 42 U.S.C. §§ 12101 et seq., 29 U.S.C. §§ 794 et seq., as well as 28 U.S.C. §1331 in that such claims arise under the laws of the United States. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over Plaintiff's claims for violations of North Carolina common law.

3.  Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 in that at all times relevant, Plaintiff resided in this district, currently resides in this district, and the violations of law complained of herein all occurred in this judicial district.

4.  Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("E.E.O.C."). On November 27, 2023 the E.E.O.C. issued a Notice of Right to Sue. The Notice is attached to this complaint as Exhibit A. Plaintiff has complied with all administrative prerequisites in order to bring this action.

## III.  PARTIES

5.  Plaintiff  John H. Espey, III, M.D. ("Plaintiff") is a resident of Chapel Hill in Chatham County, North Carolina and was a citizen and resident of Chatham County, North Carolina at all times relevant to this Complaint.

6.  Defendant UNC Health is an affiliated enterprise of The University of North Carolina created pursuant to N.C. Gen. Stat. §116-37 for the purpose of providing patient care, facilitating the education of physicians and other health care providers, conducting research and rendering other services designed to promote the health and well-being of the citizens of North Carolina. It includes The University of North Carolina Hospitals at

Chapel Hill and the clinical patient care programs established or maintained by the School of Medicine of the University of North Carolina at Chapel Hill. Defendant UNC Health is a recipient of federal financial assistance, including without limitation, federal financial assistance to Graduate Medical Education.

7.    Defendant, Benjamin Haithcock, M.D. is a citizen and resident of Durham County, North Carolina. At all times relevant to this Complaint, Defendant Haithcock was the Program Director for the Cardiothoracic Surgery Residency Program. Defendant Haithcock is sued in his individual capacity.

### IV. FACTUAL BACKGROUND

8.    Plaintiff John H. Espey, III, M.D. ("Plaintiff" or "Dr. Espey") holds an undergraduate degree from Cornell University and a Doctor of Medicine degree from Albany Medical College. He holds a North Carolina Resident Training License issued by the North Carolina Medical Board and a Medical License from the State of New York.

9.    Following receipt of his medical degree, Dr. Espey began his education and employment as a Resident Physician with UNC Health in June 2018. Dr. Espey's appointment was in the cardiothoracic surgery program in the Division of Cardiothoracic Surgery.

10.    Between June 2018 and November 1, 2022 Dr. Espey was both an employee and a graduate medical trainee whose performance was regularly evaluated by supervising physicians on the surgical services to which he was assigned.

11.    Dr. Espey has been diagnosed with and has suffered from Depression, Anxiety and Attention Deficit Disorder. Dr. Espey's medical conditions have been successfully treated by his physicians and therapists, including with medication management.

12. During 2018, 2019, 2020 and the early part of 2021, any symptoms associated with Dr. Espey's medical conditions were controlled with medications and he was able to perform the essential functions of his job without seeking any accommodation from his employer.

13. Between June 2018 and July 2021, Dr. Espey was consistently evaluated as meeting his employer's legitimate job expectations and as performing satisfactorily as an employee/ trainee. For instance, his supervisors commented that he was "doing great on [the cardiothoracic] service;" was "more advanced for his current level of training;" was "a very good resident;" demonstrated "above-average performance;" and that he was a "solid resident [who was performing] [a]ppropriate for or somewhat above current expectations for his level of training." During the latter half of his third year as a Resident Physician, his supervising physician wrote that Dr. Espey was "doing great work. Demonstrating increased responsibility and technical ability."

14. Each year Defendant UNC Health requires Resident Physicians to sign a standard contract, titled "University of North Carolina Hospitals GME Appointment Agreement" (hereafter "Agreement"). Included in the Agreement are the parties' respective obligations regarding the policies and procedures to be followed. Section 2.0 of the Agreement states that UNC Health is responsible to provide the benefits that are

> *specified on UNC Hospitals GME [Graduate Medical Education] Website and related applicable policies, practices, procedures, rules, bylaws, and the regulations of UNC Hospitals, the UNC Health Care System (the governing body of UNC Hospitals), the UNC School of Medicine or UNC School of Dentistry Department(s) to which the Trainee is assigned, and the Medical or Dental Staff bylaws, as appropriate.*

The Agreement describes the location of said policies and states that

*the terms of each applicable UNC Hospitals' and UNC Health Care*
*System policy, practice, procedure, rule, bylaw, and regulation*
*(collectively, "UNC Hospitals' Policies"), including but not limited to*
*those expressly referenced in this Agreement, are herein incorporated by*
*reference as if fully set forth herein;*

15.     The policy on duty hours for Resident Physicians is included in those policies which

Defendant UNC has incorporated into the Agreement and to which Defendant has

obligated itself to follow.  That policy contains the following relevant provisions:

a)      UNC Hospitals Policy on Duty Hours and the [Accreditation Counsel for

Graduate Medical Education] ACGME requirements take precedence over

all other policy statements and apply to all sites to which residents are

assigned.

b)      Duty hours must be limited to 80 hours per week, averaged over a 4-week

period, inclusive of all in-house call activities and all moonlighting and

special duty projects.

c)      Residents must be scheduled for one day free of duty every week when

averaged over four weeks. At home call cannot be assigned on these free

days.

d)      Duty periods of all residents may be scheduled to a maximum of 24 hours

of continuous duty in the hospital. . . . After 24 hours of continuous duty,

the resident may remain on-site for transitions of care and/or to attend an

educational conference when that transition is completed, but this period

of time must be no longer than an additional four hours. No new patients

may be assigned or additional clinical duties assigned (including

continuity clinics) during those additional four hours. . . . After 24 hours of in-house duty, residents must have 14 hours free of duty before the next scheduled duty period.

e) Time spent in the hospital by residents on at-home call must count toward the 80-hour maximum weekly hour limit. The frequency of at-home call . . . must satisfy the requirement for one-day-in-seven free of duty, when averaged over four weeks. At-home call must not be so frequent or taxing as to preclude rest or reasonable personal time for each resident.

16. Between May 2020 and June 2021 Plaintiff was regularly expected to work schedules which violated the UNC Hospitals Policy on Duty Hours. For instance, Dr. Espey was assigned at-home call for up to twelve nights in a row and often for at least five nights in a given week. As a result of continuous assignment as the at-home call physician on the cardiac and/or thoracic services, Dr. Espey often did not have duty-free days as required by Defendant UNC Health's policy. Because he was assigned at-home call without a reduction in other duty assignments, Dr. Espey frequently worked more than 24 consecutive hours in the hospital. Because a supervising resident would frequently assign Dr. Espey to be the at-home call physician with little advance notice, Dr. Espey often worked more than the maximum average of 80 hours per week.

17. By the Spring of 2021, Plaintiff was extremely sleep deprived and began to exhibit symptoms consistent with sleep deprivation. Being sleep deprived also exacerbated symptoms associated with his underlying medical conditions, as sleep deprivation eroded the efficacy of prescription medications in controlling symptoms.

18. Plaintiff requested that his physician make medication adjustments in order to help control symptoms. Some of those adjustments caused additional symptoms such as excessive sweating and hand tremors.

19. Plaintiff began keeping a private record of his duty hours and his duty-free hours. Plaintiff recorded that during the month of June 2021 his average weekly duty hours had exceeded the 80-hour per week maximum; that during the first week of June 2021 he did not have fourteen consecutive duty-free hours after twenty-four hours of in house care; that he had worked a twenty-four hour shift with only five hours off-duty before beginning his next shift; and that during the second week of June Plaintiff worked thirty-four consecutive hours in the hospital with just eleven hours off-duty before beginning his next shift.

20. On July 8, 2021 Plaintiff met with Defendant Haithcock who was the Program Director for the Cardiothoracic Surgery Residency Program. The purpose of that meeting was for Defendant Haithcock to review Plaintiff's performance as a Resident Physician over the previous year. Plaintiff shared with Defendant Haithcock that he was regularly being subjected to duty hour violations and that he believed that those violations were negatively impacting his health. Plaintiff was seeking Defendant Haithcock's assistance with the continuing violations of the duty hour policy and believed that Defendant Haithcock understood that the duty-hour violations needed to be addressed by him.

21. The duty hour violations continued in July 2021. For instance, during the week beginning July 19, 2021, Plaintiff worked one hundred twenty-two hours, including working thirty-nine and a half consecutive hours on July 22, 2021 and was required to

7

work on July 23, 2021 with only four hours between shifts. During the following week, beginning July 26, 2021, Plaintiff worked twenty-four consecutive hours and returned to work after just six hours away from the hospital.

22.     While the average hours for July 2021 did not exceed the eighty-hour limit, the frequent violations of the mandatory time free policies continued to worsen the effects of Plaintiff's sleep deprivation and trigger symptoms associated with Plaintiff's anxiety and attention deficit disorder.

23.     Despite the extreme working conditions Plaintiff experienced during July 2021, one of Plaintiff's supervising physician complimented Plaintiff's demonstration of skill and confidence in the operating room on a formal evaluation of that month's performance.

24.     Between August 2021 and October 2021 duty hour violations continued.  For instance, during the week of August 10, 2021 Plaintiff worked twenty-eight consecutive hours in the hospital and then reported for his next shift with less than fourteen hours off duty. On September 2, 2021 Plaintiff worked thirty-six consecutive hours with no break for sleep. Throughout the entire months of September and October 2021 Plaintiff was assigned at-home call each Monday through Friday night and then frequently was assigned weekend call which made it much more likely that he would be called into the hospital after his regular shift had ended.

25.     On October 8, 2021 Defendant Haithcock, on behalf of Defendant UNC Health, issued Plaintiff a "letter of deficiency" claiming that there were specific performance issues which Plaintiff needed to address through a performance improvement plan outlined in the letter.  Plaintiff believed then that specific allegations regarding performance were

inaccurate and, instead, reflected supervisors' observations regarding his sleep deprived appearance and medication induced comportment, such as excessive sweating. Plaintiff has consistently denied the factual accuracy of many statements in Defendant Haithcock's October 8, 2021 letter. Plaintiff reminded Defendant Haithcock that he believed that the constant duty hour violations were an impediment to job performance.

26. Nevertheless, immediately after receipt of the October 8, 2021 letter, Plaintiff chose not to directly challenge the accusations regarding performance and instead made his best efforts to comply with the performance improvement plan despite the fact that Defendants' violation of duty hour policies continued to take its toll on his health.

27. Defendant UNC Health's policies and practice are to document residents' performance after each rotation on a surgical service on a standardized form that includes ratings of a minimum of fifteen discrete performance areas with additional space for narrative comments, providing written documentation of performance at approximately one-month intervals.

28. Defendant Haithcock was responsible for completing two of Plaintiff's evaluations via the standardized forms for the months of August 2021 and September 2021 and the blank forms were made available to him to complete well ahead of October 8, 2021. Yet, no formal evaluations of Plaintiff were completed by him for August 2021 and September 2021. These two evaluations, as well as an evaluation for the month of October 2021, were ultimately completed by Defendant Haithcock in January 2022.

29. Plaintiff's evaluation for the month of November 2021 was completed by another supervising physician but not until February 2022. In that evaluation, completed after

Plaintiff had complained about duty hour violations, the supervising physician suggested that Plaintiff needed to do more to "commit" to the surgical service.

30. On March 30, 2022 Defendant Haithcock issued Plaintiff a "Management Directed Referral" for a medical examination. In that referral letter, Defendant Haithcock noted areas of concern and stated that "prior to June 2021" Dr. Espey "did not exhibit any of those behaviors" that were cited as concerns. Defendant Haithcock further stated that the identified behaviors were believed to be "symptomatic of a condition that needs to be addressed by a healthcare provider."

31. The concerns cited in the March 30, 2022 letter, which Defendant Haithcock attributed to an underlying medical condition, were the same concerns cited in the October 8, 2021 "letter of deficiency."

32. Plaintiff accepted the referral and took a leave of absence pursuant to his rights under the Family Medical Leave Act beginning April 1, 2022 until July 24 2022.

33. Whereas Plaintiff's prior request that Defendant address the duty hour violations was made orally during his July 2021 meeting and his October 8, 2021 meeting with Defendant Haithcock, on March 31, 2022 Plaintiff made a written record of his view that the duty hour violations were responsible for the health issues that now required him to seek extended medical treatment and that being forced to work under conditions that consistently violated duty hour policies distorted the assessment of his ability to perform his job duties.

34. Although Plaintiff was on Family Medical Leave, Defendant Haithcock insisted that Plaintiff's performance vis a vis the October 8, 2021 letter of deficiency and the

performance improvement plan be evaluated on April 15, 2022. Plaintiff was required to return to the workplace on April 15, 2022 for that evaluation.

35. The April 15, 2022 evaluation described Plaintiff's performance as "satisfactory" on five of the seven directives under the performance improvement plan. One of the remaining two areas was an assessment of Plaintiff's performance on the thoracic in-training exam. Assessment of that performance objective was deferred because the results were not yet available on April 15, 2022. Ultimately, it was determined that Plaintiff's score on the exam was satisfactory.

36. Thus, before beginning his medical leave, Plaintiff had satisfactorily completed six of the seven objectives of the performance improvement plan required by the October 8, 2021 letter of deficiency.

37. The only area of the October 2021 Performance Improvement Plan where it was alleged that Plaintiff did not meet expectations concerned a directive related to communication and exchange of information. The April 15, 2022 evaluation stated that it was this area which "prompted [the program leadership] to pursue the management directed referral" on March 30, 2022.

38. The "communication and exchange of information" directive contained the most ambiguous and subjective criteria for measurement: "evaluations and feedback from patients, families and health professionals, faculty and other care providers." Plaintiff has never been presented with any written documentation reflecting such evaluations and feedback.

39.     Ultimately, Plaintiff, on his own, solicited and received extensive documentation from
        "health professionals, faculty and other care providers," with whom he worked and who
        provided numerous specific statements attesting to the Plaintiff's effective
        communication behaviors, particularly concerning patient care and patient treatment
        plans.

40.     Plaintiff was medically evaluated in April 2022 by an evaluator chosen by the
        Defendants.  As part of the evaluation Plaintiff disclosed his medical history, including
        prior diagnoses related to his mental health.  Those disclosures were included in the
        medical evaluator's report, as was Plaintiff's disclosure regarding his prior and ongoing
        medical treatment for mental health.

41.     The evaluator recommended a period of leave from work that included treatment for
        medical conditions which had been exacerbated during the previous eight months.  The
        evaluator's report was provided directly to the Defendant Haithcock in its entirety.

42.     During his Family Medical Leave, Plaintiff received medical treatment that included both
        adjustments in medication and behavioral health counseling.

43.     On July 15, 2022, as required by Defendant UNC Health, Plaintiff submitted to a fitness
        for duty medical examination by the evaluator selected by Defendants. The evaluator's
        conclusions, shared directly with Defendant Haithcock, were that there was no evidence
        of unresolved mental health struggles, no concerns regarding inattentiveness or other
        traits which could make Plaintiff vulnerable to making errors at work, and that Plaintiff
        had demonstrated a dramatic decrease in symptoms associated with his underlying
        medical conditions and a demonstrable increase in his ability to manage his medical

conditions. The evaluator stated that "from a mental health perspective, there are no known barriers preventing him [Dr. Espey] from immediately returning to work."

44. The evaluator selected by the Defendants later communicated directly with Plaintiff and told Plaintiff that he had "aced everything" on the July 15, 2022 fitness-for-duty evaluation.

45. On July 25, 2022 Plaintiff returned to work, having been pronounced fit for duty by Defendants' approved medical evaluator, having satisfactorily completed six of the seven items identified on Defendants' Performance Improvement Plan, and, by Defendant Haithcock's own admission, with the cause for the remaining item attributed to an underlying, but now resolved, medical condition.

46. On July 25, 2022 when Plaintiff returned to work Defendant Haithcock informed Plaintiff that the Performance Improvement Plan was being extended for an additional six months due to Plaintiff being out on "mental health leave."

47. When he returned to surgical services directed by supervising physicians other than Defendant Haithcock it became apparent to Dr. Espey that Defendant Haithcock had shared information about his [Dr. Espey's] underlying medical conditions. For instance, one supervising physician specifically mentioned that he believed that Dr. Espey's performance had been affected by "concerns outside the hospital." When the remark was repeated months later, Dr. Espey asked the supervising physician to identify what he meant by "concerns outside the hospital" and the supervising physician admitted that he was referring to Dr. Espey's mental health.

48. On another occasion this same supervising physician made a forced and transparent dramatization of asking Plaintiff to perform a routine task during an operation, implying with the dramatization that Plaintiff was nervous about performing the task. Defendant Haithcock observed the supervising physician's feigned concern and agreed with Plaintiff that the other physician's display was absurd and nonsensical.

49. During the extended probationary period Plaintiff was required to meet with Defendant Haithcock every two weeks to discuss performance and progress. Between July 25, 2022 and October 4, 2022, Defendant Haithcock did not once express any specific concerns about Plaintiff's performance and there were no standardized evaluation forms rating Plaintiff's performance completed at any time between July 25, 2022 and the end of Plaintiff's employment with Defendants.

50. On September 20, 2022, Plaintiff presented to the Emergency Department experiencing heart palpitations. After being evaluated and treated, he sought to remain out of work the following day as recommended his treating physician. When Plaintiff requested to remain out of work the day following his emergency room visit, Defendant Haithcock was sarcastic and condescending.

51. On September 28, 2022 Plaintiff had completed a shift in the hospital working twenty-nine hours continuously. As Defendant UNC Health's duty hour policy requires, Plaintiff made arrangements for another provider, in this case a senior resident, to assume care for his cases for the rest of the afternoon. Plaintiff sent a message to his supervising physician for the service to which he was assigned, informing his supervisor that he was transitioning care in order to comply with the duty hour policies.

52. Defendant Haithcock learned, upon information and belief from the supervising physician to whom Plaintiff had sent a message about transitioning care, that Plaintiff was planning to leave the hospital after twenty-nine continuous duty hours and telephoned Plaintiff. Defendant Haithcock's tone of voice when he addressed Plaintiff was very angry and he spoke sarcastically to Plaintiff when he stated: "I am befuddled as to why you think it's O.K. for you to go home and rest!" Plaintiff responded by citing applicable UNC duty hour policies. Defendant Haithcock continued in an angry tone, yelling at Plaintiff that "You have already made your decision, so just go home!" Then Defendant Haithcock hung up the telephone. Moments later Defendant Haithcock saw Plaintiff as Plaintiff was completing the transition of patient care, and in the presence of other providers, yelled to Plaintiff, "What are you still doing here? Leave!"

53. Plaintiff's experience as a Resident Physician was that Defendant UNC Health and the supervising physicians in the Division of Cardiothoracic Surgery regularly violated Defendant UNC Health's duty hour policies and expected resident physicians to adopt the supervising physicians' view that the duty hour policies should be ignored.

54. On October 5, 2021 Defendant Haithcock met with Plaintiff and accused Plaintiff of being unable to perform his job duties as a Resident Physician. Plaintiff asked for specific examples. For most of his claims Defendant Haithcock did not provide any specific examples; for other claims Defendant Haithcock made statements which were unequivocally false. Plaintiff asked that he be permitted to meet with the other supervising physicians to whom Defendant Haithcock had attributed specific information

in order to confront the false allegations. Initially, Defendant Haithcock said he would try to arrange such a meeting and a meeting was set for October 10, 2022.

55. When Plaintiff arrived to meet with Defendant Haithcock and the other supervising physicians on October 10, 2022, Defendant Haithcock informed Plaintiff that there would not be a meeting with other supervising physicians and that Defendant Haithcock was placing Plaintiff on administrative leave, intending to dismiss Plaintiff from his employment position and Defendant's residency program.

56. On October 25, 2022 Defendant Haithcock presented Plaintiff with a letter dismissing Plaintiff from his employment and from the Cardiothoracic Residency Program ("termination letter"). Defendant Haithcock's termination letter repeated the unsubstantiated hyperbolic statements which Defendant Haithcock had asserted in the October 5, 2022 meeting with Plaintiff. Further, the termination letter stated that "dismissal from the program is reportable and will be reported to the North Carolina Medical Board."

57. On November 9, 2022, subsequent to his dismissal, Plaintiff asked Defendant UNC Health to provide him with all written evaluations of his performance, including all evaluations of his performance since returning from medical leave on July 25, 2022, including any complaints or statements of deficiencies about his performance.

58. On or around December 16, 2022 Defendant UNC Health provided Plaintiff with copies of the standardized evaluations purported to reflect performance evaluations between July 25, 2022 and October 25, 2022. ***All of the standardized evaluation forms for Plaintiff's work on various surgical services between July 25, 2021 and October 25, 2021 were***

*completed on November 15, 2022, after Plaintiff had been dismissed from his employment and after Plaintiff had requested documentation of alleged complaints about his performance since returning from medical leave*.

59. Plaintiff appealed Defendant Haithcock's decision to terminate his employment. Dr. Thomas Ivester, Vice President for Medical Affairs and Mr. Rowell Daniels, Chief Operating Officer conducted a review of Defendant Haithcock's decision. In his initial meeting with Ivester and Daniels regarding his appeal, Dr. Ivester indicated that, although he would follow the normal review process, he would not consider Plaintiff's claim that the dismissal was motivated by discrimination on the basis of his disability.

60. As part of his appeal, Plaintiff submitted numerous artifacts as well as more than fifteen different statements from colleagues with whom he worked and which directly and overwhelmingly refuted the allegations made by Defendant Haithcock.

61. As part of their review, Dr. Ivester and Mr. Daniels spoke with and/or met with UNC Health employees believed to have relevant information regarding the allegations made by Defendant Haithcock, including supervising physicians, advanced practice professionals such as Physicians Assistants and Nurse Practitioners, resident physicians, nurses and students. By their own admission, Ivester and Daniels received consistent statements that strongly and positively endorsed Plaintiff's competencies as a physician, including, without limitation, Plaintiff's professionalism, clinical decision making, and attentiveness to patient care. Dr. Ivester concluded that Plaintiff's character and performance qualified him for a residency program at UNC and elsewhere.

62.   However, although their review of the termination decision had shown that much of what Defendant Haithcock had written in the termination letter was not true, Ivester and Daniels stopped short of endorsing Plaintiff's return to his position as a resident in the Division of Cardiothoracic Surgery.

63.   Upon information and belief, their unwillingness to reverse Defendant Haithcock's termination decision was based upon false information provided by Defendant Haithcock and two other physicians to whom Defendant Haithcock had disclosed Plaintiff's medical condition.  The false information concerned whether Plaintiff was mentally and emotionally stable in the operating room.  Ivester and Daniels took the position that Plaintiff's only "performance concerns were isolated to specific technical components of certain cardiac surgical cases."  Ivester told Plaintiff that he believed that Plaintiff had a "pressure point for stress" that affected performance in the operating room.  Ivester acknowledged that he did not know whether the alleged pressure point was a factor in all operating rooms, or, "specific to cardiac" operations or "specific to certain personalities."

64.   Contrary to the statements made by Defendant Haithcock and the two physicians with whom he had shared Plaintiff's private medical information, after Plaintiff had received treatment for his underlying medical condition, had been evaluated as fit-for-duty by a medical provider approved by the Defendants and returned to work on July 25, 2022, there was no instance in which Plaintiff's performance in the operating room was affected by a "pressure point for stress."

65.   Since Ivester and Daniels declined to consider whether Defendant Haithcock had discriminated against Plaintiff based on his disability, and, since there was no

contemporaneously recorded data regarding Plaintiff's operating room performance after returning from Family Medical Leave, the review was intentionally biased by Defendant Haithcock's negative views of mental illness and his reckless distortion of the evidence to justify a decision that was motivated by discriminatory animus.

66. Upon information and belief, when Defendants reported Plaintiff's termination to the North Carolina Medical Board Defendants reported that Plaintiff's ability to practice medicine should be investigated due to Plaintiff's underlying illness.

67. At the time that Defendants made their report to the North Carolina Medical Board Defendants knew that Plaintiff had been pronounced fit-for-duty as a Resident Physician. Defendants had asked their approved medical provider to examine Plaintiff and respond to the question: "Is the employee able to perform the essential functions of their position at this time?" On July 25, 2022 Defendants' medical provider responded unequivocally, "Yes," and offered further explanation including that "the psychological testing confirmed his mental and emotional stability" and that "there are no known barriers preventing him from immediately returning to work."

68. Upon information and belief, the claim made to the North Carolina Medical Board that Plaintiff's medical condition was potentially disqualifying for licensure as a physician came from Defendant Haithcock.

69. Defendant Haithcock knew that Plaintiff's medical condition was not interfering with Plaintiff's competencies as a physician.

70. As a direct consequence of Defendants' false report to the North Carolina Medical Board Dr. Espey was required to undergo lengthy, expensive and invasive medical testing,

including a comprehensive neuropsychological evaluation, by order of the North Carolina Medical Board.

71. Initially, Dr. Espey was ordered to an examination by the North Carolina Professionals Health Program. That examination revealed no underlying mental or emotional issues and concluded that Dr. Espey was safe to practice medicine. However, the North Carolina Medical Board ordered further testing, stating that it pursued the further testing in order to evaluate the discrepancies between what was reported by Defendant UNC Health and the objective data with which they had been presented.

72. The neuropsychologist who completed the comprehensive neuropsychological testing of Dr. Espey ordered by the North Carolina Medical Board found that Dr. Espey's "general intellectual functioning" was "superior" relative to same-aged peers, that there were no attentional factors impacting general intellectual functioning, that "reasoning and problem solving skills were generally high average or better and no deficits were evident in executive functions assessed." The neuropsychologist concluded that there were no neurocognitive issues or concerns regarding Dr. Espey's ability to safely practice medicine.

73. In summary, Plaintiff's underlying medical condition only affected his job performance when Defendants failed to follow duty hour policies that are adopted nationally for the safety of physicians and patients. Defendants' conduct exacerbated Plaintiff's underlying medical condition but Plaintiff successfully treated his medical condition and was pronounced fit to return to work as a Resident Physician. Since July 25, 2022 there has never been any evidence to remotely suggest that Plaintiff's underlying medical condition

in any way impacted his ability to safely perform the essential functions of his job or participate in UNC's residency program. However, based on unverified statements received from Defendants UNC Health and Haithcock, Dr. Espey was required to undergo extensive testing which also verified that his underlying medical condition did not impact his ability to safely perform the essential functions of his job or participate in UNC's residency program.

74. Nevertheless, based solely upon the statements made by the Defendants to the North Carolina Medical Board Dr. Espey is now required to disclose to potential employers and residency programs to which he has applied that he was referred for psychological testing by the North Carolina Medical Board.

75. As a result of Defendants' actions, including but not limited to: dismissing Plaintiff from the medical residency program, terminating his employment and reporting to the North Carolina Medical Board that Plaintiff's underlying disability posed an impediment to his ability to be licensed as a physician in North Carolina, Plaintiff has suffered ongoing and irreparable harm.

76. Plaintiff's damages include: lost wages, loss of future earnings and earning capacity; loss of educational opportunities; increased costs for health care and other pecuniary expenses associated with being unemployed and unable to continue his medical education; and emotional pain and suffering associated with the aforementioned losses along with the humiliation and invasiveness of the steps Plaintiff has had to undertake to disprove the false statements made by the Defendants; and, including pain and suffering due to the economic impact that the employment and educational losses have had on his family.

## IV. SOVEREIGN IMMUNITY

77.    Sovereign immunity is waived by Defendant UNC Health with respect to claims arising under the Americans with Disabilities Act pursuant to N.C. Gen. Stat. §143-300.35. Sovereign immunity is waived by Defendant UNC Health with respect to claims arising under the Rehabilitation Act of 1973 by its acceptance of federal funds.  Sovereign immunity is waived by Defendant UNC Health with respect to claims arising under contract law by UNC Health's decision to enter into a contract with the Plaintiff.

## V. CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF AGAINST DEFENDANT UNC HEALTH
DISABILIITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH
DISABILITIES ACT, AS AMENDED**

78.    Plaintiff repeats and realleges by reference each and every allegation contained in paragraphs 1 through 77 and incorporates the same herein as though fully set forth.

79.    Defendant UNC Health is an employer within the meaning of the Americans with Disabilities Act, as amended.

80.    Plaintiff has an impairment that limits one or more life activities.  Plaintiff has been diagnosed with and has suffered from Depression, Anxiety and Attention Deficit Disorder.  When not treated with medication Plaintiff's disabilities limit thinking, concentration, memory, and caring for oneself.

81.    Plaintiff has a record of an impairment based on the diagnoses identified in the preceding paragraph.

82. During the time when Plaintiff's impairment was successfully treated with medication, Defendant regarded Plaintiff as suffering from an impairment that limited his thinking, concentration, memory and ability to work.

83. Plaintiff is qualified for the position of a resident physician in a cardiothoracic surgery residency program. Plaintiff is qualified by education and training and met the legitimate expectations of his employer, as evinced by contemporaneously recorded standardized evaluations, and observations of supervising physicians, resident physicians, and advanced practice professionals.

84. Plaintiff was able to perform the essential functions of his position as a resident physician in Defendant's cardiothoracic surgery residency program as long as he was permitted to properly treat his impairing conditions, including without limitation, with medications and with reasonable duty hours.

85. Plaintiff engaged in protected activity when he requested that Defendant's Cardiothoracic Surgery Residency Program Director address violations of Defendant's duty hour policies that were negatively impacting Plaintiff's health, when he requested a day off following an emergency room visit and when he informed supervisors, as described in paragraphs fifty-one and fifty-two above, that he was transitioning patient care in order to comply with duty hour policies.

86. Defendant intentionally discriminated against the Plaintiff because of his disability in the following ways:

a) Defendant unlawfully disclosed Plaintiff's medical diagnosis to its Program Director, Defendant Haithcock, who then shared that information with other supervisors;

b) Defendant discharged Plaintiff based on his record of impairment;

c)    Defendant discharged Plaintiff because Defendant regarded Plaintiff as disabled;

d)    Defendant retaliated against Plaintiff when Plaintiff asked for a reasonable accommodation.  Specifically, when Plaintiff requested repeatedly that Defendant reasonably comply with its own duty hour policies in order to avoid an exacerbation of Plaintiff's underlying health conditions Defendant Haithcock falsely accused Plaintiff of deficient job performance and recommended that Plaintiff be dismissed from his employment position;

e)    Defendant retaliated against Plaintiff after Plaintiff engaged in protected activity by complaining to UNC Health administrators that he was dismissed due to discrimination based on disability.  Defendant Haithcock and/or Defendant UNC Health made false reports to the North Carolina Medical Board regarding Plaintiff's competencies to be a licensed physician.

87.    Proximately, directly, and solely as a result of UNC Health's discrimination and retaliation against Plaintiff on account of his disability, Plaintiff has suffered and continues to suffer damages consisting of lost wages and other employment benefits, loss of earning capacity, great mental pain and suffering associated with the economic impacts of Defendant's conduct on Plaintiff and his family. Plaintiff has incurred and will continue to incur personal expenses consequential to Defendant's conduct, including but not limited to job search expenses, costs for health care, penalties from financial and investment institutions and other damages which will be shown during the litigation of this matter.  Plaintiff is, therefore, entitled to recover compensatory damages, back pay, and other equitable relief as provided by law.

## SECOND CLAIM AGAINST DEFENDANT UNC HEALTH
## DISABILITY DISCRIMINATION IN VIOLATION OF SECTION 504 OF THE
## REHABILITATION ACT OF 1973

88.　Plaintiff repeats and realleges by reference each and every allegation contained in paragraphs 1 through 87 and incorporates the same herein as though fully set forth.

89.　Plaintiff is an individual with a disability protected by Section 504 of the Rehabilitation Act of 1973 and is qualified to receive the educational benefits of Defendant UNC Health's medical residency program.

90.　Defendant UNC Health receives federal financial assistance from the U.S. Department of Health and Human Services and is subject to Section 504 of the Rehabilitation Act and its implementing regulations.

91.　Section 504 of the Rehabilitation Act provides that no qualified individual with a disability shall be subjected to disability-based discrimination under any program or activity receiving federal financial assistance.

92.　Defendant UNC Health discriminated against the Plaintiff by excluding him from its academic, research and occupational training programs because of his disability.

93.　Defendant UNC Health discriminated against the Plaintiff by using criteria or other methods of administration, namely by ignoring its own duty hour policies, and which had the effect of defeating or substantially impairing Plaintiff's accomplishment of the objectives of the residency program.

94.　Proximately, directly, and solely as a result of UNC Health's violations of its obligations under the Rehabilitation Act and the accompanying regulations, Plaintiff has suffered and continues to suffer lost educational and occupational training opportunities.  Because

Defendant UNC Health accepted federal funds in support of Plaintiff's participation in its residency program, Plaintiff is precluded from receiving opportunities in other medical residency programs.

95. Proximately, directly, and solely as a result of UNC Health's violations of its obligations under the Rehabilitation Act and its accompanying regulations, plaintiff has suffered and continues to suffer other damages consisting of loss of earning capacity and great mental pain and suffering associated with the economic impacts of Defendant's conduct on Plaintiff and his family. Plaintiff is, therefore, entitled to recover compensatory damages and other equitable relief as provided by law.

## THIRD CLAIM AGAINST DEFENDANT UNC HEALTH
### BREACH OF CONTRACT

96. Plaintiff repeats and realleges by reference each and every allegation contained in paragraphs 1 through 95 and incorporates the same herein as though fully set forth.

97. Plaintiff had a valid contract with Defendant for employment and for participation in Defendant's residency program.

98. Defendant failed to perform its obligations under that contract, failing to act in good faith and to make reasonable efforts to enforce its own duty hour policies which were incorporated into its contract with Plaintiff.

99. Defendant's failure to perform its own obligations under the contract caused Plaintiff's termination from the residency program.

100. As a direct and proximate result of Defendant's willful, knowing and intentional breach of contract, Plaintiff has suffered lost wages, loss of educational opportunities, loss of earning capacity and has incurred increased expenses for, among other items, job search

expenses, costs for health care, penalties from financial and investment institutions and other damages which will be shown during the litigation of this matter.

### FOURTH CLAIM AGAINST DEFENDANT HAITHCOCK
### TORTIOUS INTERFERENCE WITH CONTRACT

101. Plaintiff repeats and realleges by reference each and every allegation contained in paragraphs 1 through 100 and incorporates the same herein as though fully set forth.

102. A valid contract existed between Plaintiff and UNC Health for Plaintiff's participation, through employment and other educational and training opportunities, in the Residency Program of UNC Health's Division of Cardiothoracic Surgery.

103. Defendant Haithcock intentionally made knowingly false statements about Plaintiff's job performance between July 25, 2022 and October 25, 2022 in order to induce UNC Health not to perform its obligations under its contract with the Plaintiff.

104. Defendant Haithcock made false statements about Plaintiff's job performance without any lawful reason for doing so.

105. Defendant Haithcock made false statements to the UNC Health's Graduate Management Office and to Defendant UNC Health's Vice President for Medical Affairs and/or its Chief Operating Officer in retaliation for Plaintiff's complaints about violations of duty hour policies and disability discrimination and solely for the purpose of causing injury to the Plaintiff.

106.  Proximately, directly, and solely as a result of Defendant Haithcock's unlawful conduct Plaintiff has suffered and continues to suffer damages consisting of lost wages and other employment benefits, loss of earning capacity, great mental pain and suffering associated

with the economic impacts of Defendant's conduct on Plaintiff and his family. He has incurred and will continue to incur personal expenses consequential to Defendant's conduct, including but not limited to job search expenses, costs for health care, penalties from financial and investment institutions and other damages which will be shown during the litigation of this matter. Plaintiff is, therefore, entitled to recover compensatory damages and other equitable relief as provided by law.

107. Defendant Haithcock created or directed others to create fraudulent documents regarding Plaintiff's job performance. Defendant acted with actual malice toward Plaintiff based on Defendant's animus toward Plaintiff's medical condition. At all times relevant, Defendant knew that the statements he made about Plaintiff's job performance between July 25, 2022 and October 25, 2022 were false statements and his publication of those statements to other decision makers in the UNC Health organization was willful and wanton conduct.

108. Plaintiff is entitled to punitive damages against Defendant Haithcock based on Haithcock's fraudulent, malicious and/or willful and wanton conduct.

## FIFTH CLAIM AGAINST DEFENDANT HAITHCOCK
### ABUSE OF PROCESS

109. Plaintiff repeats and realleges by reference each and every allegation contained in paragraphs 1 through 108 and incorporates the same herein as though fully set forth.

110. The North Carolina Medical Board ("NCMB") is a regulatory agency of the State created for the purpose of regulating the practice of medicine and surgery in the State of North Carolina.

111. Among its powers and duties is the power to issue valid process for the purpose of compelling licensees to submit evidence to the NCMB demonstrating the licensee's continuing competence in the practice of medicine.

112. Defendant Haithcock willfully abused the process of the NCMB by submitting or causing to be submitted false statements regarding Plaintiff's mental and emotional competencies to be a licensed physician in the State of North Carolina.

113. Defendant Haithcock knew at the time that he made such statements that a competent medical provider selected by UNC Health had pronounced Plaintiff fit for duty.

114. Defendant Haithcock knew at the time that he made the aforementioned statements that, after Plaintiff had been pronounced fit for duty, there were no specific incidents which could remotely be construed as calling into question Plaintiff's mental and emotional competencies to be a licensed physician.

115. Defendant Haithcock acted solely in retaliation for Plaintiff's complaints about Defendant Haithcock's discriminatory and wrongful dismissal of Plaintiff from the Cardiothoracic Surgery Residency Program.

116. Proximately, directly, and solely as a result of Defendant Haithcock's unlawful conduct Plaintiff  was subjected to humiliation and invasive medical examinations. He has incurred and will continue to incur personal expenses consequential to Defendant's conduct, including but not limited to the expenses of medical examinations and other expenses necessary for his defense before the NCMB.  Plaintiff is also suffering from a loss of economic and educational opportunities as a direct result of Defendant's abuse of process, in that Plaintiff is required to disclose that he was subjected to investigation by

the North Carolina Medical Board.  This required disclosure is an impediment to successfully obtaining an employment or residency training position.  Plaintiff is, therefore, entitled to recover compensatory damages and other equitable relief as provided by law.

117.	Defendant acted with actual malice toward Plaintiff based on Defendant's animus toward Plaintiff's medical condition and because Plaintiff complained about Defendant's discriminatory treatment.  At all times relevant, Defendant knew that the statements he made about Plaintiff's competencies as a physician were false and his publication of those statements to the North Carolina Medical Board was willful and wanton conduct.

118.	Plaintiff is entitled to punitive damages against Defendant Haithcock based on Haithcock's malicious and/or willful and wanton conduct.


## V.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays the court:

1.	AS TO THE FIRST CLAIM FOR RELIEF:

a.	For judgment against the Defendant in such sums as a jury may award as compensatory damages, pursuant to the Americans with Disabilities Act for the violation of Plaintiff's civil right to be free from discrimination in employment;

b.	For a judgment declaring the employment practices of Defendant alleged herein to be unlawful;

c.	For an order requiring the Defendant to make whole the Plaintiff by reinstating him to the position of employment he would have enjoyed had Defendant not engaged in

its unlawful practices, by providing Plaintiff appropriate back pay, front pay, and reimbursement for lost benefits in an amount to be shown at trial, and by granting Plaintiff other appropriate affirmative relief;

d.      For recovery of Plaintiff's costs herein, including a reasonable attorney's fee pursuant to the provisions of the Americans with Disabilities Act.

2.      AS TO THE SECOND CLAIM FOR RELIEF:

a.      For judgment against the Defendant in such sums as a jury may award as compensatory damages, pursuant to Section 504 of the Rehabilitation Act of 1973 for the violation of Plaintiff's civil right to be free from discrimination in education and employment;

b.      For a judgment declaring the educational and employment practices of Defendant alleged herein to be unlawful;

c.      For an order requiring the Defendant to make whole the Plaintiff by reinstating him to the residency program in the Division of Cardiothoracic Surgery restoring the standing in the program that he would have enjoyed had Defendant not engaged in its unlawful practices, by providing Plaintiff appropriate compensation for lost benefits in an amount to be shown at trial, and by granting Plaintiff other appropriate affirmative relief;

d.      For recovery of Plaintiff's costs herein, including a reasonable attorney's fee pursuant to the provisions of the Rehabilitation Act of 1973.

3.     AS TO THE THIRD CLAIM FOR RELIEF:

a.     That Plaintiff be awarded general and compensatory damages against Defendant UNC Health in amounts to be proved at trial, including prejudgment interest as by law allowed, and

b.     That the costs of this action be taxed against Defendant, as by law provided and for such other legal and equitable relief as this Court finds just and proper.

4.     AS TO THE FOURTH CLAIM FOR RELIEF:

a.     That Plaintiff be awarded general and compensatory damages against Defendant Haithcock, in amounts to be proved at trial, including prejudgment interest as by law allowed;

b.     That Plaintiff be awarded punitive damages against Defendant Haithcock in his individual capacity with interest thereon as by law provided; and

c.     That the costs of this action be taxed against Defendant Haithcock as by law provided and for such other legal and equitable relief as this Court finds just and proper.

5.     AS TO THE FIFTH CLAIM FOR RELIEF:

a.     That Plaintiff be awarded general and compensatory damages against Defendant Haithcock, in amounts to be proved at trial, including prejudgment interest as by law allowed;

b.     That Plaintiff be awarded punitive damages against Defendant Haithcock in his individual capacity with interest thereon as by law provided; and

c.     That the costs of this action be taxed against Defendant Haithcock as by law provided and for such other legal and equitable relief as this Court finds just and proper.

6.     For a trial by jury as to all issues so triable;

7.     For such other relief as to the court may seem just and proper.

Respectfully submitted, this the 21st  day of February 2024.


              THE LEONLAW FIRM, P.C.


              ___/s/ Mary-Ann Leon_____
                    MARY-ANN LEON.
                    N.C. State Bar No. 26476
                    711 Harbor Lakes Ln.
                    Katy, TX 77494
                    Tel: (252) 830-5366
                    Fax: (1-252) 862-2707
                    Email: maleon@leonlaw.org