IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JOHN ESPEY, III, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:24-cv-00128 |
| UNIVERSITY OF NORTH CAROLINA | ) | |
| HEALTH CARE SYSTEM, and BENJAMIN E. | ) | |
| HAITHCOCK, M.D. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM ORDER AND OPINION**

Before the Court is a Motion to Dismiss the First Amended Complaint (ECF 23) filed jointly by defendants University of North Carolina Health Care System and Benjamin E. Haithcock. The motion is **GRANTED IN PART** and **DENIED IN PART**.

I.     BACKGROUND

The most relevant facts, taken in the light most favorable to the plaintiff, are as follows. See *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (stating that, when reviewing a motion to dismiss, the court must "accept as true all of the factual allegations contained in the complaint").

In 2018, plaintiff John H. Espey, III, began a cardiothoracic surgery residency with UNC Health, where he was supervised by program director Benjamin Haithcock. ECF 21 ¶¶ 7, 9. Espey has been "diagnosed with and has suffered from Depression, Anxiety, and Attention Deficit Disorder," conditions that "have been successfully treated by his physicians and therapists, including with medication management." ¶ 11. While Espey was employed at UNC Health he was regularly evaluated and received comments from his supervisors stating that he was "performing satisfactorily." ¶ 13. For example, Espey was told that he was "doing great on [t]he cardiothoracic

1

service," that he was "a very good resident," and that he demonstrated "above-average performance." *Id.* (alterations removed).

Between May 2020 and June 2021, Espey was "regularly expected" to work long hours and frequent shifts, in violation of UNC's internal duty hours policy. ECF 21 ¶¶ 15–16. As a result, Espey became "extremely sleep deprived," which "exacerbated symptoms associated with his underlying medical conditions" and "eroded the efficacy of prescription medications in controlling [his] symptoms." ¶ 17. Espey "requested that his physician" adjust his medications. ¶ 18. Those adjustments "caused additional symptoms such as excessive sweating and hand tremors." *Id.*

In July 2021, Espey told Haithcock "that he was regularly being subjected to duty hour violations and that he believed that those violations were negatively impacting his health." ECF 21 ¶ 20. Even after that conversation, Espey was repeatedly asked to work frequent shifts and long hours in violation of UNC's internal policies, including a 39.5-hour shift on July 22, 2021, and a 36-hour shift on September 2, 2021. ¶¶ 21–24.

In October 2021, Haithcock issued Espey a "letter of deficiency" on behalf of UNC Health, claiming that Espey had "specific performance issues" and outlining a performance improvement plan for Espey to follow. ECF 21 ¶ 25. Espey believed "that specific allegations regarding performance were inaccurate and, instead, reflected supervisors' observations regarding his sleep deprived appearance and medication induced comportment, such as excessive sweating." *Id.* Espey "reminded" Haithcock "that he believed that the constant duty hour violations were an impediment to job performance." *Id.* Still, Espey "made his best efforts to comply with the performance improvement plan." ¶ 26.

Several months later, Haithcock issued Espey a "referral letter" for a "medical examination," which re-raised concerns from the earlier letter of deficiency and explained that

2

Espey had been exhibiting particular behaviors which could be "symptomatic of a condition that needs to be addressed by a healthcare provider." ECF 21 ¶¶ 30–31. Espey accepted the referral and took a leave of absence from his residency on April 1, 2022. ¶ 32. Two weeks later, while on leave, Espey "underwent a medical examination" based on the referral letter. *Id.* The examiner determined that Espey's "underlying mental health conditions interfered with his ability to accurately recall information . . . and that the constellation of underlying depression, physiological manifestations of anxiety and attention-deficit difficulties were preventing [Espey] from remaining fully focused in the workplace, retaining necessary information, and, managing his anxiety when in pressure situations." *Id.* The examiner "recommended a period of leave from work that included treatment for medical conditions which had been exacerbated during the previous eight months." ¶ 41.

      The day after Espey's medical examination and while Espey was still on leave, Espey was "required to return to the workplace" for an "evaluation" of his job performance as judged against the performance improvement plan that had been instituted several months earlier. ECF 21 ¶ 34. That evaluation described Espey's performance as "satisfactory" on six of the seven "directives" of the performance improvement plan. ¶ 35. The seventh and final directive "related to communication and exchange of information." ¶ 37. The evaluation stated that Espey "did not meet expectations" on that directive and that it was that directive "which prompted the program leadership to pursue" Espey's referral to a medical examiner. *Id.* (alterations and quotation marks removed). Despite that evaluation, the complaint alleges that Espey had not received any other "written documentation" finding fault with his "communication and exchange of information." ¶ 38. The complaint also alleges that Espey has "solicited and received extensive documentation from 'health care professionals, faculty, and other care providers,' with whom he worked and who

3

provided numerous specific statements attesting to [Espey's] effective communication behaviors." ¶ 39.

Espey spent almost four months on leave. ECF 21 ¶ 32. During that leave, Espey "received medical treatment that included both adjustments in medication and behavioral health counseling." ¶ 42. Before returning to work, Espey "submitted to a fitness for duty medical examination" by an evaluator selected by UNC Health. ¶ 43. The evaluator determined "there was no evidence of unresolved mental health struggles, no concerns regarding inattentiveness or other traits which could make [Espey] vulnerable to making errors at work, and that [Espey] had demonstrated a dramatic decrease in symptoms associated with his underlying medical conditions." *Id.* The evaluator concluded that "from a mental health perspective, there are no known barriers preventing" Espey from "immediately returning to work." *Id.* After receiving that clearance, Espey returned to work. ¶ 45.

When Espey returned to work, he learned that other supervising physicians had learned about his mental health conditions. ECF 21 ¶ 47. Espey alleges that Haithcock learned about his particular diagnoses because they were included in a report shared with Haithcock after his medical examination. ¶¶ 40–41. The complaint further alleges that Haithcock shared that information with other supervising physicians, and did so without Espey's permission. ¶¶ 47–48.

Several months after Espey returned to work, he "experienc[ed] heart palpitations" and went to the emergency room. ECF 21 ¶ 50. After he was treated, he "sought to remain out of work the following day as recommended [by] his treating physician." *Id.* When he requested the day off, Haithcock was "sarcastic and condescending." *Id.*

About a week later, Espey worked a 29-hour shift. ECF 21 ¶ 51. Per UNC's policy, Espey "made arrangements for another provider . . . to assume care for his cases for the rest of the

afternoon" and told a supervising physician "that he was transitioning care in order to comply with the duty hour policies." *Id.* Haithcock then called Espey and said, in an "angry" and "sarcastic[ ]" tone, "I am befuddled as to why you think it's O.K. for you to go home and rest!" ¶ 52. When Espey responded by referring to the UNC policy, Haithcock yelled "You have already made your decision, so just go home!" and hung up the phone. *Id.* As Espey was "completing the transition of patient care," he saw Haithcock in person, who yelled "What are you still doing here? Leave!" *Id.*

One week after that incident, Haithcock met with Espey and claimed that Espey was "unable to perform his job duties as Resident Physician." ECF 21 ¶ 54. The complaint alleges that, during that conversation, Haithcock could not provide specific examples of Espey's inability to perform the job and made "statements which were unequivocally false." *Id.* Espey asked for a meeting with the other supervising physicians "to whom Defendant Haithcock had attributed specific information in order to confront the false allegations." *Id.* The meeting was set for five days later. *Id.*

When Espey arrived for the scheduled meeting, Haithcock told him that there was no meeting and that he was placing Espey on administrative leave, "intending to dismiss [Espey] from his employment position and [UNC Health's] residency program." ECF 21 ¶ 55. Ten days later, on October 25, 2022, Haithcock gave Espey a termination letter dismissing him from the residency program. ¶ 56. The letter stated that "dismissal from the program is reportable and will be reported to the North Carolina Medical Board." *Id.*

After being terminated, Espey asked "UNC Health to provide him with all written evaluations of his performance." ECF 21 ¶ 57. When Espey received the evaluations, he found that all the forms evaluating his work between the time he returned from leave and his dismissal "were

5

completed on November 15, 2022, after [Espey] had been dismissed from his employment and after [he] had requested documentation" of his performance. ¶ 58.

Espey appealed his termination decision through internal channels, where it was reviewed by the Vice President of Medical Affairs and the Chief Operating Officer. ECF 21 ¶ 59. The reviewers told Espey that they would "follow the normal review process" but they would not consider Espey's claim "that the dismissal was motivated by discrimination on the basis of his disability." *Id.* The complaint alleges that the reviewers "spoke with and/or met with UNC Health employees" with whom Espey had worked and that they "received consistent statements that strongly and positively endorsed [Espey's] competencies as a physician." ¶ 61. The reviewers ultimately "concluded that [Espey's] character and performance qualified him for a residency program at UNC and elsewhere" but did not "endors[e] [Espey's] return to his position as a resident." ¶¶ 61–62.

The complaint asserts that the reviewers failed to reinstate Espey to his residency position based on "false information provided by Defendant Haithcock and two other physicians." ECF 21 ¶ 63. The reviewers told Espey that the "only performance concerns were isolated to specific technical components of certain cardiac surgical cases" and that they believed Espey "had a pressure point for stress that affected performance in the operating room." *Id.* (quotation marks removed). The complaint denies that Espey's performance in the operating room was so affected at any point after he returned from leave. ¶ 64. The complaint further alleges that the internal review process was "biased by Defendant Haithcock's negative views of mental illness and his reckless distortion of the evidence to justify a decision that was motivated by discriminatory animus." ¶ 65.

UNC Health reported Espey's termination to the North Carolina Medical Board (Board)

6

Case 1:24-cv-00128-TJH-JLW    Document 32    Filed 06/11/25    Page 6 of 16

and also stated that Espey's "ability to practice medicine should be investigated due to [his] underlying illness." ECF 21 ¶ 66. The complaint asserts that statement was false. ¶ 69. Based on UNC Health's report, the Board required Espey to "undergo lengthy, expensive and invasive medical testing, including a comprehensive neuropsychological evaluation." ¶ 70. That testing "revealed no underlying mental or emotional issues and concluded that Dr. Espey was safe to practice medicine." ¶ 71. A neuropsychologist who evaluated Espey concluded that "there were no neurocognitive issues or concerns regarding Dr. Espey's ability to safely practice medicine." ¶ 72. Despite that result, the complaint alleges that Espey will henceforth be "required to disclose to potential employers and residency programs . . . that he was referred for psychological testing by the North Carolina Medical Board." ¶ 74.

Espey sued Haithcock and UNC Health, alleging claims under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973, as well as state-law claims for breach of contract and tortious interference with contract. ECF 21 ¶¶ 78–109. As relief, Espey seeks reinstatement to his position at UNC Health, compensatory damages, a declaratory judgment, and punitive damages. ECF 21 at 34–36.

II.  **LEGAL STANDARDS**

Defendants move to dismiss the amended complaint for failure to state a claim under Rule 12(b)(6).[1] Under Rule 12(b)(6), the question is whether the complaint contains sufficient

---

[1] Defendants frame their motion to dismiss Espey's breach of contract claim based on lack of administrative exhaustion as a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). See ECF 23 at 1–2. But "[w]hether a federal court has subject matter jurisdiction over a case is wholly determined by federal law" and States "cannot strip federal courts of subject matter jurisdiction over any category of claims." *Wideman v. Innovative Fibers LLC*, 100 F.4th 490, 494 (4th Cir. 2024). The Court thus construes that portion of defendants' motion as a motion to dismiss for failure to state a claim. See *id.* at 497–98 (limitations in state law such as exhaustion requirements "only determine[] whether Plaintiffs have

7

allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When ruling on a motion to dismiss, a court must "view the complaint in a light most favorable to the plaintiff," *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993), and accept the complaint's factual allegations as true, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## III. DISCUSSION

### A. Americans With Disabilities Act Claims

The complaint asserts four claims under the ADA: (1) discrimination when UNC Health unlawfully disclosed his medical diagnoses to Haithcock; (2) wrongful termination (both because Espey was disabled and because defendants regarded Espey as disabled); (3) retaliatory termination because Espey asked for a reasonable accommodation; and (4) retaliation by providing false information to the North Carolina Medical Board after and because Espey complained that he was dismissed due to discrimination based on disability. ECF 21 at 26–29. Defendants make no arguments directed at the first claim, but argue that the second, third, and fourth claims should be dismissed. Because the Court is not persuaded by defendants' arguments, the motion to dismiss Espey's ADA claims is denied.

#### 1. Wrongful Termination Claim

To state a wrongful termination claim, the complaint must allege that: (1) Espey was "a qualified individual with a disability"; (2) he was "discharged"; (3) he was "fulfilling" his employer's "legitimate expectations at the time of discharge"; and (4) the "circumstances" of his

---

stated a claim upon which relief can be granted; [they] cannot strip [federal courts] of subject matter jurisdiction that [they] otherwise enjoy").

termination "raise a reasonable inference of unlawful discrimination." *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 272 n.9 (4th Cir. 2004).

Defendants argue that the complaint fails to sufficiently allege that Espey was a "qualified individual." ECF 24 at 9–11; see 42 U.S.C. § 12111(8) (a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position"). The Court disagrees. The complaint alleges that Espey earned his undergraduate and medical degrees before beginning residency with UNC Health. ECF 21 ¶¶ 8–9. It further alleges that, during his residency, Espey was "evaluated" as "performing satisfactorily," and that his supervisors indicated he was "a very good resident" and that he "demonstrated 'above-average performance.'" ¶ 13. The complaint also alleges that, even after Espey was terminated, UNC Health's Vice President for Medical Affairs concluded that he was "qualified . . . for a residency program at UNC and elsewhere." ¶ 61.

Defendants insist that Espey was required to and failed to specifically list the "essential functions" of his job in the complaint. ECF 24 at 9–11. But Defendants point to no authority from the Supreme Court or the Fourth Circuit holding that Espey was required to plead such a list. And the complaint alleges that Espey was a qualified individual by explaining his training, education, and regular positive evaluations completed by the doctors supervising his work. At this stage, those allegations are sufficient to state a plausible claim that Espey was a "qualified individual" under the ADA.

**2. Retaliation Claims**

To state a claim for retaliation under the ADA, the complaint must allege: (1) that Espey "engaged in ADA-protected activity"; (2) that Espey "suffered an adverse employment action";

9

and (3) "a causal link between the two." *Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 173 n.10 (4th Cir. 2024).

The complaint alleges two retaliation claims. First, it asserts that Haithcock retaliated against Espey by recommending he be fired after Espey "requested repeatedly that Defendant reasonably comply with its own duty hour policies." ECF 21 ¶ 86(d). Second, the complaint alleges that UNC Health and Haithcock retaliated against Espey by making "false reports to the North Carolina Medical Board regarding [his] competencies to be a licensed physician" after Espey complained to the internal reviewers that "he was dismissed due to discrimination based on disability." ¶ 86(e). The Court concludes that neither claim should be dismissed at this point.

The defendants argue that Espey's first retaliation claim should be dismissed because his emergency room visit and subsequent attempt to enforce the duty hours policy and leave the hospital are not protected activity. ECF 24 at 13. The Court agrees that—as pled—Espey's visit to the emergency room was not protected activity, because the complaint does not allege that the emergency room visit was related to Espey's depression, anxiety, or attention deficit disorder. But the Court disagrees that the first retaliation claim should be dismissed for failing to plausibly allege any protected activity. Requesting a reasonable accommodation is a protected activity, see *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 706 (4th Cir. 2001), and the complaint plausibly alleges that Espey requested a reasonable accommodation when he sought to enforce the duty hours policy and leave the hospital after a 29-hour shift, see ECF 21 ¶¶ 51–52. The complaint also contains sufficient allegations to plausibly suggest that defendants knew Espey was requesting an accommodation for his disability when he tried to enforce the policy. The complaint alleges that Espey had repeatedly told Haithcock "that he was regularly being subjected to duty hour violations and that he believed that those violations were negatively impacting his health," and that "he

10

believed that the constant duty hour violations were an impediment to job performance." ¶¶ 20, 25; see *Kelly v. Town of Abingdon*, 90 F.4th 158, 167 (explaining a request for a reasonable accommodation need not "formally invoke the magic words 'reasonable accommodation'"). Given those prior communications and "the surrounding circumstances," the complaint plausibly alleges that "a reasonable employer would" have viewed Espey's attempts to enforce the duty hours policy as a request for a reasonable accommodation. *Kelly*, 90 F.4th at 167.

Defendants also argue that Espey's first retaliation claim should be dismissed because he "fails to allege a nexus sufficient to show that his discharge was the result of his requested accommodations." ECF 24 at 12. Once again, the Court disagrees. The complaint alleges that Espey was placed on administrative leave and told he was being terminated just 12 days after he tried to enforce the duty hours policy by leaving the hospital, which prompted Haithcock to say: "I am befuddled as to why you think it's O.K. for you to go home and rest!" ECF 21 ¶¶ 50–52, 54–55. Haithcock's angry reaction when Espey tried to enforce the duty hours policy coupled with the "temporal proximity" between that event and Espey's dismissal suggest "a causal connection" sufficient to survive a motion to dismiss. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021). Accordingly, the motion to dismiss Espey's first retaliation claim under the ADA is denied.

As for the complaint's second retaliation claim, defendants argue it should be dismissed "because the report made to the North Carolina Medical Board . . . was mandated by North Carolina law" and thus could not have been retaliatory. ECF 24 at 14. Despite agreeing that defendants had a general reporting obligation, Espey argues that they had no obligation or authority to make false statements to the Board. ECF 25 at 18. The Court agrees with Espey. Although defendants had an obligation to report Espey's termination to the Board, the complaint also alleges

11

that defendants reported that Espey's "ability to practice medicine should be investigated due to [Espey's] underlying illness," even though by that time Espey had been "pronounced fit-for-duty as a Resident Physician" by the defendants' "approved medical provider." ECF 21 ¶¶ 66–67. Because the Court must accept as true the complaint's allegation that defendants submitted false statements to the North Carolina Medical Board—and because defendants were under no obligation to submit such false statements—the motion to dismiss the second retaliation claim is denied as well.

### B. Section 504 Claims

The complaint asserts three claims under Section 504 of the Rehabilitation Act: (1) wrongful termination; (2) discrimination when defendants ignored their own duty hours policies; and (3) retaliation by providing false information to the North Carolina Medical Board because Espey complained that he was dismissed due to discrimination based on disability. ECF 21 at 29–31. Defendants make no new arguments in support of dismissing the Section 504 claims, instead relying on their arguments in support of dismissing the ADA claims. ECF 24 at 8–14. Once again, the Court rejects those arguments and accordingly denies the motion to dismiss the Section 504 claims. See *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012) ("To the extent possible, we construe the ADA and Rehabilitation Act to impose similar requirements.").

### C. Breach of Contract Claim

Defendants argue that Espey's state law cause of action for breach of contract should be dismissed because Espey failed to allege "that he exhausted his administrative remedies as to UNC Health's termination of his employment contract, nor does he assert that seeking administrative

12

review would have been inadequate to address the alleged breach." ECF 24 at 14–15. The Court agrees.

North Carolina law provides that state employees who are "aggrieved by the final decision in a contested case" must "exhaust[ ] all administrative remedies made available to the party or person aggrieved by statute or agency rule" before seeking "judicial review." N.C. Gen. Stat. § 150B-43. North Carolina law also provides that covered state employees must seek judicial review by "fil[ing] a petition in superior court." § 150B-45. An employee who "fails to exhaust the administrative remedies that section 150B-43 provides" is "barred from bringing a subsequent, separate action . . . for breach of contract." *Frazier v. North Carolina Cent. Univ.*, 779 S.E.2d 515, 522 (N.C. Ct. App. 2015). A statute applicable during Espey's employment stated that employees of the University of North Carolina Health Care System (like Espey) "shall be deemed to be employees of the State and shall be subject to all provisions of State law relevant thereto." N.C. Gen. Stat. § 116-37(d) (repealed 2024). As a result, Espey is subject to the exhaustion requirements set out in Section 150B-43.

Espey protests that he "pursued a review of the termination decision" in accordance with UNC's internal review policies and asserts that no further exhaustion was required because UNC's policy explains that the decision rendered at the end of the internal process is "final and binding." ECF 25 at 20. But Espey identifies no authority suggesting that a state agency can exempt itself and its employees from the state's exhaustion requirements simply by referring to the decision rendered at the end of an internal process as "final and binding."

Espey next argues that even if state law would otherwise normally have required him to do more, seeking further review would have been futile here because the record from the internal appeal process was insufficient and he could not obtain adequate relief under North Carolina law's

13

prescribed process for seeking judicial review. ECF 25 at 22–25; see *Affordable Care, Inc. v. North Carolina State Bd. of Dental Exam'rs*, 571 S.E.2d 52, 58 (N.C. Ct. App. 2002) (recognizing that plaintiffs need not exhaust administrative remedies if doing so would be futile). Neither argument moves the needle. The purported inadequacy of the record is a reason that Espey might have succeeded with his appeal, not a reason to permit him to skip that step entirely. And the Court of Appeals of North Carolina has held that the unavailability of damages in a Section 150B-43 proceeding does not "necessarily render[ ] it an inadequate remedy" nor does that "obviate[ ] the APA's general exhaustion requirement." *Frazier*, 779 S.E.2d at 525. Accordingly, the Court concludes that administrative exhaustion would not have been futile and grants the motion to dismiss the breach of contract claim.

### D. Tortious Interference Claim

Defendants argue that Espey's state law claim for tortious interference against Haithcock should be dismissed based on qualified immunity. ECF 24 at 17–19. To state a claim for tortious interference a plaintiff must allege: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to [the] plaintiff." *United Lab'ys, Inc. v. Kuykendall*, 370 S.E.2d 375, 387 (N.C. 1988). Where a plaintiff brings a claim of tortious interference against a so-called "non-outsider" to the employment contract, the non-outsider "often enjoy[s] qualified immunity from liability for inducing their corporation or other entity to breach its contract with an employee." *Lenzer v. Flaherty*, 418 S.E.2d 276, 286 (N.C. Ct. App. 1992). But "[t]he qualified privilege of a non-outsider is lost if exercised for motives other than reasonable, good faith attempts to protect the non-outsider's interests in the contract

14

interfered with." *Id.* A tortious interference claim against a non-outsider can thus only survive if there is "a showing that the non-outsider acted with malice," meaning that the defendant's actions "were not prompted by legitimate business purposes." *Button v. Level Four Orthotics & Prosthetics, Inc.*, 869 S.E.2d 257, 265 (N.C. 2022).

Espey concedes that Haithcock is a non-outsider but argues that his conduct was sufficient to meet the malice standard. ECF 25 at 25–30. In particular, Espey points to the complaint's allegations that Haithcock made false statements in Espey's termination letter, false statements in Espey's evaluations, and false statements during the internal review process of Espey's termination. *Id.* at 27. Espey argues that this alleged conduct is sufficient to demonstrate malice because "it was designed to cause UNC to terminate [Espey's] contract." *Id.*

Accepting Espey's allegations as true, the Court concludes that the complaint's allegations that Haithcock repeatedly made false statements about Espey and his performance in the job are sufficient, at this stage, to support a plausible inference that Haithcock "acted with malice" and was "not prompted by legitimate business purposes." *Button*, 869 S.E.2d at 265; *see also Bloch v. The Paul Revere Life Ins. Co.*, 547 S.E.2d 51, 60 (N.C. Ct. App. 2001) (permitting a tortious interference claim against a non-outsider where the non-outsider came up with "false and defamatory accusations against the Plaintiff with the intent to bring about the termination of her employment"). Accordingly, the Court declines to dismiss Espey's tortious interference claim.

IV. **CONCLUSION**

**IT IS THEREFORE ORDERED** that defendants' motion to dismiss the amended complaint (ECF 23) is **GRANTED** with respect to the breach of contract claim and **DENIED** in all other respects.

Signed: 6/11/2025

*[signature: Toby Heytens]*

Toby Heytens
United States Court of Appeals Judge, sitting by designation[2]

---

[2] This designation was made by Chief Judge Diaz on February 12, 2025, under his authority to "designate and assign temporarily any circuit judge within the circuit . . . to hold a district court in any district within the circuit." 28 U.S.C. § 291(b).